# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TRISTANA HUNT, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> WAL-MART STORES, INC., ) <br> ) <br> Defendant. ) | No. 1:16-cv-5924 <br><br> Hon. Charles R. Norgle |

## OPINION AND ORDER

Plaintiff Tristana Hunt ("Plaintiff") brings the instant action against Defendant Wal-Mart Stores, Inc. ("Defendant") for alleged sexual harassment under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.*("Title VII"). Before the Court is Defendant's motion for summary judgment. For the following reasons, the motion is granted.

## I. BACKGROUND

Plaintiff was hired by Defendant in 2006. She injured her thumb in December 2011 and was on leave for approximately fourteen months. Plaintiff states she received worker's compensation in connection with her thumb injury. When Plaintiff returned to work in March 2013, she was assigned the overnight shift (10:00 p.m. to 7:00 a.m.) in the electronics department. Daniel Watson ("Watson") was an assistant manager who worked on the overnight shift with Plaintiff. At 12:23 a.m. on September 27, 2013, Watson issued Plaintiff a "First Written Coaching" for poor attendance/punctuality.[1] At the end of Plaintiff's shift on September 27, 2013, she approached Store Manager Mark Turner ("Turner") and complained to Turner, for the first time,

---

[1] Defendant maintains a Coaching for Improvement Policy that is designed to provide instruction and assistance where an Associate's job performance or behavior fails to meet Defendant's expectations. There are four levels of coaching in the Coaching for Improvement Policy: First Written Coaching, Second Written Coaching, Third Written Coaching, and Termination. (Def.'s Statement of Material Facts ("SOMF") at ¶¶ 8-9).

that Watson had been making unwanted sexual remarks to her for the prior several months. Plaintiff also provided a written statement regarding Watson's alleged conduct.

In her September 27, 2013 Walmart Complaint Form, (the "Complaint Form") Plaintiff alleged that Watson's inappropriate conduct began sometime in June 2013 with Watson requesting to see Plaintiff's breasts. (Def.'s SOMF, Ex. 11, at 2). Plaintiff alleged that on June 25, 2013, she told Watson that she missed the prior day because she was in Indiana and a hurricane caused a tree to fall down in front of her car. Id. Plaintiff was showing Watson pictures of that tree on her phone when Watson allegedly asked the following: "When can I see those?" while he was looking at her breasts; "When am I going to get a chance to see your breasts?"; and "How can someone so small have such big breasts?" Id. at 2, 3. The Complaint Form averred that Watson's final sexual remark was made several months later, on September 19, 2013, when he asked Plaintiff why did she have her "yams" out. Id. at 3.

Upon receiving the Complaint Form from Plaintiff, Turner provided it to Human Resources, who requested that Turner complete an investigation regarding Plaintiff's Complaint Form. Turner immediately conducted an interview of Plaintiff on September 27, 2013. The following week, Turner interviewed Watson about Plaintiff's allegations, which Watson denied. Plaintiff was not able to name any witness to corroborate her allegations and Turner concluded that Plaintiff's claims could not be substantiated and were unfounded. Nonetheless, Turner required Watson to retake the Company's ethics training course, which included anti-harassment and Equal Employment Opportunity training. Human Resources reviewed Turner's investigation and agreed with his recommendations. Watson completed the established Defendant's ethics training course on November 6, 2016.

Three weeks after Plaintiff lodged her initial September 27, 2013 Complaint Form, she had a conversation with Turner regarding the outcome of the investigation; Turner informed her nothing came of it. During this conversation, Plaintiff did not mention any additional allegations of sexual harassment nor did she ask any follow up questions regarding the investigation into her claim. Between the time Plaintiff filed her Complaint Form and the end of her employment on December 5, 2016, she did not made any additional complaints of sexual harassment or other concerns to Defendant: three years without incident.

On January 24, 2014, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights. In Plaintiff's EEOC Intake Form she alleges three incidents of sexual harassment by Watson. Two of the incidents are the same incidents she included on the Complaint Form—the June 25, 2013, and September 19, 2013 incidents. However, her EEOC Intake Form alleged a third incident on August 26, 2013, which was not in the Complaint Form. On August 26, 2013, Plaintiff alleges that Watson asked her: to see her breasts; how her breasts were so big compared to her body; and "can I see you take a shower or even better can you take a shower with me so I can play with your titties in the shower?" Pl.'s SOMF, Ex. G, EEOC Intake Form, at 1141. The EEOC issued a Notice of Right to Sue on March 14, 2016.

Plaintiff filed her First Amended Complaint ("FAC") on July 1, 2016, alleging a sexual harassment and hostile work environment claim. Plaintiff's FAC only alleges the previously discussed incidents of June 25, 2013 and August 26, 2013. The FAC is silent to the September 19, 2013 incident, and alleges no other incidents of sexual harassment other than the June and August dates, specified above. However, in Plaintiff's answers to the first set of interrogatories propounded by Defendant, Plaintiff states, for the first time, that Watson asked to see her breasts

3

on September 12, 2013. Plaintiff also states, again for the first time, that after she reported Watson to Turner, Watson continued to sexually harass her for approximately another week. (Def. SMF, Ex. 4, at 3).

Plaintiff's deposition also contains new allegations of sexual harassment by Watson that were never asserted prior to the deposition. At Plaintiff's deposition she stated that the sexual harassment started in May, not June. Plaintiff also stated that the sexual harassment occurred on a daily basis. Finally, Plaintiff did not state that any sexual harassment occurred after she filed the Complaint Form on September 27, 2013.

At all relevant times herein, Defendant had an established discrimination and harassment prevention policy. This policy strictly prohibits discrimination or harassment. The policy instructs employees to report any conduct that violates the policy by either utilizing Defendant's Ethics Helpline or reporting the conduct to a salaried member of management. Reporting to the helpline is confidential and can be done anonymously. Defendant trains its employees on how to report any concern regarding possible violations of its anti-harassment policy.

Plaintiff avers that due to Watson's conduct she began suffering from dizziness, anxiety, insomnia, panic attacks, post-traumatic stress disorder, weight gain, depression, and hair loss. She further alleges that due to these ailments, she took a leave of absence from October 26, 2013 to on or around November 24, 2013. Plaintiff also sought short-term disability benefits for this time. On January 8, 2014, Plaintiff again took a leave of absence, and received short-term disability through June 2014. Plaintiff then applied for long-term disability, and was on disability leave until August 2015. Defendant held the position open for Plaintiff while she was on leave. Defendant only terminated her on December 5, 2016, for the stated reason that she failed to return to work from medical leave.

Defendant now moves for summary judgment on Plaintiff's claim of sexual harassment and ensuing hostile work environment in violation of Title VII.

### II. ANALYSIS

#### A. Standard of Review

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The court must view "the record in the light most favorable to the nonmovant and [avoid] the temptation to decide which party's version of the facts is more likely true." Id.

#### B. There Remain Questions of Fact and Credibility Regarding the Severe and Pervasive Nature of Watson's Alleged Conduct

"Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964." Lapka v. Chertoff, 517 F.3d 974, 982 (7th Cir. 2008). To state a claim for a hostile work environment, the Plaintiff must show that (1) she was subject to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. Johnson v. Advocate Health & Hosps.

5

Corp., 892 F.3d 887, 900 (7th Cir. 2018). "To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment." Scruggs v. Garst Seed Co., 587 F.3d 832, 840 (7th Cir. 2009).

The parties devote significant time to arguing the issue of whether the alleged harassment was so severe or pervasive to create a hostile work environment. However, a review of the evidence submitted, including Plaintiff's own statements regarding the alleged harassment, leave the details of the alleged harassment muddled. The parties here dispute the frequency of the alleged harassment and Plaintiff's own allegations regarding the harassment vary considerably. It is the factfinder's duty to weigh the evidence and make credibility determinations, not the court when ruling on a motion for summary judgment. Payne, 337 F.3d at 770. Accordingly, the Court is presently unable to determine whether Plaintiff suffered a hostile work environment. Thus, the Court turns its attention to the fourth element, the basis for Defendant's liability.

**C. Defendant is not Vicariously Liable for Watson's Alleged Sexual Harassment**

To prevail on her hostile work environment claim, Plaintiff must demonstrate that Defendant is vicariously liable for Watson's conduct. Anicich v. Home Depot U.S.A., Inc., 852 F.3d 643, 650 (7th Cir. 2017) (stating that under Title VII, employers are vicariously liable for hostile environments created by their supervisors). However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

6

opportunities provided by the employer or to avoid harm otherwise." Id. (hereinafter the "Ellerth Defense"). The Court must first determine whether the Ellerth Defense is available to Defendant, since it did not plead the Ellerth Defense as an affirmative defense in its answer.

### 1. Defendant is permitted to raise the Ellerth Defense for the first time in its motion for summary judgment

Defendant's prior counsel did not plead the Ellerth Defense in Defendant's Answer to Plaintiff's First Amended Complaint. Typically, a party must plead affirmative defenses in its answer to properly preserve them. Fed. R. Civ. P. 8(c). An exception to this general rule arises where the defense is a "logical outgrowth of the evidence." Akrabawi v. Carnes Co., 152 F.3d 688, 693 (7th Cir. 1998) (concurring with the trial court decision to allow the defendants to amend their answer on the final day of trial, after two prior amendments, where the affirmative defense was anticipated by the plaintiffs and, thus, stating plaintiffs suffered no prejudice from the amendment).

Here, the Ellerth Defense was clearly a focus of Defendant during discovery. Discovery elicited copious details pertaining to Defendant's sexual harassment policy, the different procedures employees can use to report harassment, and Plaintiff's decision not to report the alleged harassment for several months. Moreover, Plaintiff had the opportunity to respond to the Ellerth Defense in her response to the motion for summary judgment. See Jackson v. Rockford Housing Authority, 213 F.3d 389 (7th Cir. 2000) (holding as a general rule that defendants have been allowed to raise an affirmative defense when the plaintiff had adequate notice that the defense was available and had adequate opportunity to respond to it). Accordingly, the Court determines that Defendant is permitted to raise the Ellerth Defense, such defense is a natural consequence from the discovery conducted and Plaintiff suffers no prejudice.

### 2. Plaintiff has not established constructive discharge

Having held that the Defendant may present the Ellerth Defense its motion for summary judgment, despite its tardiness in doing so, the Court turns its attention to whether the Ellerth Defense is applicable. The Ellerth Defense is unavailable as an affirmative defense where there was a tangible employment action taken against the plaintiff. Ellerth, 524 U.S. at 765. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. Plaintiff argues that she was constructively discharged when she decided to take medical leave and thus suffered a tangible employment action. The Court disagrees that Plaintiff was constructively discharged or that constructive discharge would preclude Defendant from raising the Ellerth Defense, absent an official act by Watson.

First, Plaintiff claims she was constructively discharged when she took medical leave as a consequence of the alleged harassment. A claim for constructive discharge under Title VII arises "when an employer makes an employee's working conditions so intolerable that an employee is forced into involuntary resignation." Roby v. CWI, Inc., 579 F.3d 779, 785 (7th Cir. 2009). "The working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because an employee is expected to remain employed while seeking redress." McPherson v. City of Waukegan, 379 F.3d 430, 440 (7th Cir. 2004).

In cases where courts found constructive discharge, the harassment present was significantly severe and often included violence or threats of violence. See Taylor v. W. & S. Life Ins. Co., 966 F.2d 1188 (7th Cir. 1992); Brooms v. Regal Tube Co., 881 F.2d 412 (7th Cir. 1989). In Taylor, the court found constructive discharge where the plaintiff's immediate supervisor constantly made racist jokes, used racial slurs, and brandished a pistol at the plaintiff's head, took photos of the incident, and then circulated the photos at a work meeting while using racial slurs.

8

Taylor, 966 F.2d at 1191. In Brooms, there was also constructive discharge where the plaintiff was subject to numerous explicit racial and sexual remarks over a sixteen month period by her supervisor. Brooms, 881 F.2d at 416. These remarks came to a head when the supervisor showed the plaintiff a racist pornographic photograph, informed her that she was hired for the purposes of performing the sexual conduct exhibited in the photograph, and then threatened to kill her. Id.

While Watson's alleged conduct is undoubtedly inappropriate, the alleged conduct does not amount to constructive discharge. See Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 878 (7th Cir. 1999) (holding that a threat by a co-worker that "someone should take a dish and knock [the plaintiff] upside the head" was not sufficient for constructive discharge); see also Saxton v. Am. Tel. & Tel. Co., 10 F.3d 526, 528 (7th Cir. 1993); Drake v. 3M, 134 F.3d 878, 884 (7th Cir. 1998); Roby v. CWI, Inc., 579 F.3d 779, 785 (7th Cir. 2009) (holding there was no constructive discharge where the plaintiff's co-worker made sexually suggestive statements toward her over numerous months, pressed his body against her buttocks, put his arm around plaintiff, smack her on the buttocks, and plaintiff was required to continue working with the co-worker after reporting the behavior).

Here, Plaintiff's allegations primarily regard Watson inquiring as to when he would be able to see her breasts. Plaintiff never alleged that she was threatened by Watson, that Watson ever toucher her, or that she was concerned for her safety. Moreover, at the time Plaintiff went on medical leave she was not suffering any harassment by Watson—Watson's alleged sexual harassment ended with Defendant's investigation. Plaintiff's allegations are more akin to the abuse suffered in Simpson, Saxton, Drake and Roby, as opposed to the vicious harassment exhibited in Taylor and Brooms. Accordingly, Watson's alleged conduct was not so egregious as to establish constructive discharge.

### 3. Plaintiff fails to demonstrate Watson's conduct was an official act

Next, even if the Court found Plaintiff was constructively discharged, that does not necessarily preclude Defendant from asserting the Ellerth Defense. "Unlike an actual termination, which is *always* effected through an official act of the company, a constructive discharge need not be." Pa. State Police v. Suders, 542 U.S. 129, 148 (2004) (emphasis in original). While "a constructive discharge is functionally the same as an actual termination in damages-enhancing respects," when an *official act does not* underlie the constructive discharge, the employer is permitted to raise the Ellerth Defense. Id. (reasoning that absent an official act of the company, the employer would ordinarily have no reason to suspect a supervisor's misconduct as the basis for an employee's resignation—this uncertainty justifies affording the employer the opportunity to establish the Ellerth Defense); see also Doe v. Lansal, Inc., No. 08 CV 5983, 2009 WL 5166224, at *5 (N.D. Ill. 2009) (citing Lutkewitte v. Gonzales, 436 F.3d 248, 269 (D.C. Cir. 2006)) ("Without an observable act, the employer has no way of knowing that its delegated authority has been brandished in such a way as to coerce sexual submission.").

Accordingly, the issue is whether Watson's alleged sexual harassment was an official act of Defendant. "When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation," unlike how "a co-worker can break a co-worker's arm ... [or] can inflict psychological injuries by his or her offensive conduct." Ellerth, 524 U.S. at 761-62. "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates," and therefore they "requir[e] an official act of the enterprise, a company act." Id. The Supreme Court recognized in Ellerth that "there are acts of harassment a supervisor might commit which might be the same acts a co-

employee would commit, and there may be some circumstances where the supervisor's status makes little difference." Id. at 763.

Here, Watson's alleged sexual harassment was not an official act; thus, Plaintiff's alleged constructive discharge would not constitute a tangible employment action. In analyzing whether a supervisor's conduct constitutes an official act of the employer, the Supreme Court in Suders cited the analysis in two circuit cases for guidance—Reed v. MBNA Mktg. Sys., 333 F.3d 27 (1st Cir. 2003) and Robinson v. Sappington, 351 F.3d 317, 319 (7th Cir. 2003). In Reed, the plaintiff alleged that the supervisor made repeated sexual comments, and an incident where the supervisor sexually assaulted her. 333 F.3d 27, 33 (1st Cir. 2003). The court held that the supervisor's conduct "was exceedingly unofficial and involved no direct exercise of company authority." Id. The court further stated that the supervisor's behavior "is exactly the kind of wholly unauthorized conduct for which the [Ellerth Defense] was designed." Id.; compare Robinson, 351 F.3d 317.

In Robinson, the plaintiff worked as a judicial secretary for a judge and alleged that the judge made several overtly sexual comments, including an offer to purchase the employee a sexual device, and expressing outrage at the possibility of the plaintiff's romantic involvement with anyone. Id. at 320, 330. After the plaintiff reported the judge's alleged behavior, the presiding judge decided to transfer her to another judge; however, he also informed her that the new judge would "make her life hell for six months" and suggested that she resign. Id. at 337. In its determination of whether the constructive discharge was a tangible employment action for purposes of the Ellerth Defense, the court focused primarily on the presiding judge's conduct, stating "[t]his was not simply a situation in which a supervisor was inflicting harassment on a subordinate." Id. The court concluded that the presiding judge took official action when transferring the plaintiff and made the suggestion that she resign. Id. The court reasoned that the

11

transfer was only possible due to the presiding judge "hav[ing] been empowered by the employer to make economic decisions affecting other employees under his or her control." Id.

It is evident that the allegations presented here are similar to those in Reed, sexual harassment by a supervisor absent official conduct. Watson's alleged harassment is conduct that is not unique to his position as a supervisor—a co-worker could engage in the same conduct. Watson's conduct was not empowered by the employer, as in Robinson. Finally, although Watson's supervisory status may have facilitated his harassment of Plaintiff, this is not sufficient to establish an official act. Reed, 333 F.3d at 33. Thus, Watson's alleged sexual harassment is not an official act; Plaintiff did not suffer a tangible employment action; and Defendant is permitted to raise the Ellerth Defense.

**4. Defendant satisfies both elements of the Ellerth Defense**

To reiterate, the Ellerth Defense comprises two necessary elements: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher v. City of Boca Raton, 524 U.S. 775, 807, (1998).

Here, regarding the first element, Defendant was not aware of Watson's alleged sexual harassment of Plaintiff until she reported it on September 27, 2013. Upon receiving Plaintiff's Complaint Form, Defendant began investigating the allegations on the same day and Turner interviewed Plaintiff regarding her allegations on September 27, 2013. The Defendant's Global Ethics Office officially opened a case regarding Plaintiff's allegation on October 1, 2013, only three days after Plaintiff's Complaint Form. Plaintiff was unable to provide Turner with any names of any witnesses to the alleged conduct. On October 5, 2013, Turner interviewed Watson regarding

the allegations, only eight days after Plaintiff's Complaint Form. Watson categorically denied making any such comments. Turner was unable to substantiate Plaintiff's claims, but, nonetheless, required Watson to retake the Company's Ethics training course.

Upon the completion of the investigation, Plaintiff does not allege that she suffered any further sexual harassment from Watson. In fact, after Plaintiff filed her Complaint Form, she never reported any subsequent harassment by Watson. "An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." McKenzie v. Ill. DOT, 92 F.3d 473, 480 (7th Cir. 1996). As soon as Plaintiff reported the alleged sexually harassment, Defendant acted immediately to investigate, correct, and prevent future conduct. With no evidence to the contrary, Defendant's conduct prevented the recurrence of sexual harassment toward Plaintiff. Accordingly, Defendant has met the first element. See Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1049 (7th Cir. 2000); Jackson v. Cty. of Racine, 474 F.3d 493, 501 (7th Cir. 2007); McPherson v. City of Waukegan, 379 F.3d 430, 441 (7th Cir. 2004) (all three cases deciding that the defendants' conduct in response to sexual harassment allegations were reasonable where the defendants undertook investigations and procedures substantially similar to the process Defendant followed here).

In regards to the second element, Title VII's design is "to encourage the creation of antiharassment policies and effective grievance mechanisms." Ellerth, 524 U.S. at 764. "[T]ying the liability standard to an employer's effort to install effective grievance procedures ... advance[s] Congress' purpose to promote conciliation rather than litigation of Title VII controversies." Suders, 542 U.S. at 145. (internal citations omitted). It is Defendant's burden to show that Plaintiff

13

"unreasonably failed to take advantage of any preventive or corrective opportunities that it provided." Jackson, 474 F.3d at 502.

Here, Defendant has met its burden. As stated above, Defendant adheres to a discrimination and harassment prevention policy that prohibits discrimination. The policy instructs employees to report any conduct that violates the policy to a member of management or to utilize Walmart's Ethics Helpline. Reporting to the helpline is confidential and can be done anonymously. Plaintiff admits that she was trained on reporting concerns to a manager and was aware of the Ethics Helpline. However, Plaintiff did not report Watson's sexual harassment in May when it allegedly began. Rather, Plaintiff waited until September 27, 2013, approximately four to five months after the first alleged incident. Based on the evidence provided, no rational juror could conclude Plaintiff's conduct was reasonable. See Jackson, 474 F.3d at 502 (holding that where the defendant had a similar harassment policy to Defendant, it was unreasonable for the plaintiff to wait four months prior to reporting the sexual harassment); Roby, 579 F.3d at 786 (also holding that where the defendant had a similar harassment policy to Defendant, a five months delay in reporting was an unreasonable).

## III. CONCLUSION

Plaintiff has failed to demonstrate that Defendant was vicariously liable for Watson's alleged conduct. Plaintiff did not present sufficient evidence to demonstrate she was subject to an adverse employment action; nor did Watson's alleged sexual harassment create an environment so intolerable as to support constructive discharge. Furthermore, even assuming *arguendo* that Plaintiff was constructively discharged, Watson's conduct did not include an official act and, therefore, any constructive discharge did not amount to a tangible adverse employment action that would bar the Ellerth Defense. Finally, Defendant has demonstrated that it exercised reasonable

care to prevent and correct promptly any sexually harassing behavior and that Plaintiff unreasonably failed to take advantage of the preventative and corrective opportunities Defendant provided. For the reasons stated herein, Defendant is not vicariously liable for Watson's alleged sexual harassment as the purported ensuing hostile work environment. Accordingly, Defendant's motion for summary judgment is granted. Civil case terminated.

IT IS SO ORDERED.

ENTER:

*[signature: Charles R Norgle]*

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: October 10, 2018